UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF IDAHO

| | |
|---|---|
| JOSHUA OQUENDO and AMBER OQUENDO (fka AMBER HALL), husband and wife,<br><br>    Plaintiff,<br><br>        v.<br><br>CITY OF BOISE, et al.,<br><br>    Defendants. | Case No. 1:15-cv-322-BLW<br><br>**MEMORANDUM DECISION AND ORDER** |

## INTRODUCTION

The Court has before it cross-motions for partial summary judgment. The Court heard oral argument on the motions on February 8, 2017, and took the motions under advisement.  For the reasons explained below, the Court will grant in part and deny in part both motions.

## FACTS

On August 14, 2013, Boise City police officers Martinez and Ransom pulled over a pickup truck driven by Amber Hall for having a broken tail light.  Amber

had two passengers, Joshua Oquendo and Henry Hall.  The time was 10:16 p.m.
*See CAD Report (Dkt. No. 19-7)[1]; Martinez Declaration (Dkt. No. 17-3)* at p. 2.

Both officers approached the truck.  Officer Martinez was a new officer and
was being supervised by Officer Ransom at this time.  *See Complaint (Dkt. No. 2)*
at ¶ 15.

Officer Martinez advised Amber of her broken tail light, asked for her
driver's license, registration, and insurance, and asked if she would consent to a
search of the truck.  She provided the documents but refused to give consent to the
search.  After Amber turned over the requested documents, the officers returned to
their patrol car.

Officer Martinez then realized Amber's insurance card had expired.  He
returned to the truck, obtained a current insurance card, and returned to his patrol
car.

At this point, the officers called dispatch for a K-9 unit to do a drug sniff of
the car.  At 10:19 p.m., the K-9 unit officer that evening – Officer Bonas –

---

[1] The CAD Report is a computerized dispatch print-out showing the times that officers reported
to dispatch that they were conducting various activities such as making a traffic stop, arriving to, and
leaving from, a crime scene, etc.  Obviously, the CAD Report is not a minute-by-minute account of the
officers' activities because it only records the times they called into dispatch.  But it is helpful in
assigning times to certain important events.  The CAD Report shows that (1) the traffic stop was
conducted at 10:16 pm; (2) Officer Bonas responded to the call for a K-9 unit at 10:19 p.m. and arrived on
scene at 10:28 p.m.; (3) Officer Hilton arrived on scene at 10:21 pm.; (4) Officer Bonas had completed
his work, was back in his patrol car, and was clear to handle another call at 10:50 p.m.; and (5) Officers
Martinez and Hilton transported Amber and Joshua to jail around 11:02 p.m.  *See CAD Report (Dkt. No.
19-7).*

responded to the call and started proceeding to the truck's location.  *See Bonas Deposition (Dkt. No. 19-7)* at p. 40.

The officers used their computer to run the names of the truck's occupants for criminal background checks:  They ran Amber at 10:20 p.m., Joshua at 10:22 p.m., Henry at 10:24 p.m., and the truck license plate at 10:27 p.m.  *See Martinez Declaration (Dkt. No. 17-3)* at ¶ 12.   During this time – around 10:21 pm. – Officer Hilton arrived on scene to assist the officers.  *See CAD Report, supra.*

While sitting in his patrol car, Officer Martinez was not completing the citation for the broken taillight.  *See Martinez Deposition (Dkt. No. 19-3)* at p. 69; *Martinez Declaration (Dkt. No. 17-3)* at ¶ 13 ("I had not completed a citation for no tail lights when K-9 Officer Steve Bonas arrived at the scene with his dog at approximately 10:28 p.m.").  He would not complete the citation until after the drug-dog sniff.  *See Ransom Declaration (Dkt. No. 17-4)* at ¶ 18 (stating that "[a]fter the drug sniff was completed, I directed Officer Martinez to finish his cite . . .").  In fact, Officer Martinez did not actually "finish up" the citation, and give it to Amber, until after he had arrested Amber and transported her to the jail.  *See Martinez Deposition, supra,* at p. 69 (stating that the citation "probably would have been finished at the jail based on everything that happened.  That's probably where I would have finished it up at.").

As the officers sat in their patrol car, the K-9 Unit Officer Bonas arrived at 10:28 pm.  *See CAD Report (Dkt. No. 19-7); Bonas Declaration (Dkt. No. 17-6)* at ¶ 2.  By now, about 12 minutes had elapsed since Amber's truck was pulled over. Thinking "the stop was taking an extraordinarily long time," Amber began using her cell phone to record video of the police.  *See Amber Oquendo Declaration (Dkt. No. 25-3)* at ¶ 26.

Officer Bonas discussed the situation with Officers Martinez and Ransom for a few minutes and then let his drug-dog out to pee.  *See Bonas Deposition (Dkt. No. 19-6)* at pp. 34-35.

Amber recalls waiting "at least 15 to 20 minutes" in the truck until the police approached with the dog.  *Id.* at ¶ 31.  That would mean that the officers approached the car with the drug dog between 10:33 p.m. and 10:38 p.m.  By then, the traffic stop would have lasted 17 to 22 minutes.[2]

Officers Martinez and Ransom, along with K-9 Officer Bonas and Officer Hilton, approached the truck.  Officer Martinez had not completed the citation for the broken taillight and so their purpose in approaching the truck was not to serve

---

[2] Officer Martinez recalls a much quicker series of events.  According to his account, it was 10:30 p.m. when he notified Joshua that he was under arrest.  *See Martinez Declaration, supra,* at ¶ 26. That did not occur until after the drug-dog sniff, and after Joshua and Amber (1) were ordered to exit the truck, (2) yelled at the officers, (3) were handcuffed, and (4) were placed in separate patrol cars.  *Id.* at ¶¶ 21-22.  If Officer Martinez is believed, the traffic stop was far shorter than alleged by Amber.  But as will be discussed below, *the officers' own testimony* shows that the traffic stop was prolonged by 12 to 17 minutes for the drug-dog sniff.  That is the key time-period for the qualified immunity analysis and it does not depend on resolving the conflict between Amber and Officer Martinez.

the citation.  Rather, their sole purpose was to remove the truck's occupants so that a drug sniff could be completed.  Up to this point, the officers agree, the truck's occupants had been cooperative and pleasant.

Officer Martinez directed "all occupants of the vehicle to step out so that a drug sniff could be performed."  *See Martinez Declaration, supra,* at ¶ 14.  Amber was video recording the police with her cell phone at this time.  *Amber Oquendo Declaration, supra,* at ¶ 39.

If the situation is frozen at this point, the traffic stop has lasted about 17 to 22 minutes, the truck's occupants are getting ready to exit the truck, and the drug dog is ready to take a run around the car.  A smooth exit of the truck would take only about 2 minutes, and the drug-dog run around the car would take an additional minute.  *See Bonas Deposition, supra,* at p. 54.

The exit and the sniff would take about 3 minutes if all went smoothly.  That 3 minutes would be a delay in the traffic stop because the purpose of the stop – to issue a citation – had been abandoned during this time.  Moreover, there was an earlier delay when Officer Bonas arrived on the scene, talked to the other officers and allowed his dog to pee.  If those 2 minutes are added to the 3 minutes for the exit and sniff, there is a 5-minute delay in the traffic stop associated with the drug-dog sniff.

But this still does not capture the full extent of the delay, which must also include the delay by Officer Martinez in preparing the citation. Despite having the assistance of three other officers, Officer Martinez failed to complete the citation. Instead he abandoned the citation to join the other three officers in approaching the truck for the drug-dog sniff. Thus, the delay in writing the citation must be added to the delay caused the sniff itself.

The delay in writing the citation can be computed through Officer Martinez's own testimony. After the sniff was over, Officer Martinez would have had to write up the citation, a task that would take him between 5 and 10 minutes. *See Martinez Deposition (Dkt. No. 19-3)* at p. 47 (estimating that writing out a citation may take 10 minutes but might be shortened to 5 minutes if "I'm writing super fast"). He then would have to take some time to explain it to Amber, perhaps 2 minutes. In all, the traffic stop is prolonged by Officer Martinez's delay in writing the citation by 7 to 12 minutes. Adding these minutes to the 5 minutes identified earlier (the exit and sniff delay) means that the traffic stop was prolonged by about 12 to 17 minutes, assuming all would have gone smoothly.

But everything did not go smoothly. When Officer Martinez ordered the occupants of the truck to exit, Joshua observed that Amber "hesitated" in complying with Officer Martinez's command. *See Joshua Oquendo Declaration (Dkt. No. 25-4)* at ¶ 37. Amber recalls that "[t]he officers' display of power and

force to remove us from our vehicle and search us and the pickup for nothing more than a broken taillight was shocking and made me angry." *See Amber Oquendo Declaration, supra,* at ¶ 35.  Amber started yelling at Officer Martinez, calling him a "fucking pig." *See Martinez Audiotape* at 5:38 to 41.  After Amber's initial hesitation, she "started to get out" but Officer Martinez opened the door and "physically yanked her out of the pickup." *Joshua Oquendo Declaration, supra,* at ¶ 38.

Now out of the truck, Amber started walking away "which is what I thought they wanted," she later recalled.  *See Amber Oquendo Declaration, supra* at ¶ 46. But "Officer Martinez then physically grabbed and yanked me and insisted that I go where he directed me." *Id.* at ¶ 47.  Amber was screaming, "I don't give a fuck, what the fuck do you want me fucking to do, Mother Fucker." *See Martinez Audiotape* at 6:00.

Officer Martinez asked Amber if she had any weapons her, and Amber answered, "Fuck, I wish." *Id.* at 6:04.  At this point, Officer Martinez decided to handcuff Amber for officer safety purposes.  *See Martinez Declaration, supra,* at ¶ 16.

Amber recalls that at this point, "Officer Martinez shoved me up against the vehicle, smashing my belly, incurring great pain, and causing me to yell at him and call him names." *Id.* at ¶ 53.  Amber was concerned because she was six-months

pregnant.  After being placed in handcuffs, Amber alleges that Officer Martinez "then took his hands and, with the open palm of his hand, ran them up into my crotch and into and under my bra.  The way he touched me appeared and felt very sexual and I expressed that to him." *Id.* at ¶¶ 55-56.

Amber alleges that just before she was handcuffed, Officer Martinez took her cell phone away.  She alleges that "[b]ecause it was open and recording, the recording was obvious." *Id.* at ¶ 61.  Officer Martinez asked if he could search her cell phone and Amber refused.  She alleges that "he went through my phone anyway.  Later when I got my phone back, the recording had been completely erased." *Id.* at ¶¶ 74-75.

Officer Martinez recalls it much differently.  He recalls that "she did not appear or claim to be recording the incident." *See Martinez Declaration, supra,* at ¶ 17.  He explains that "[i]n order to place handcuffs on Amber, I needed to take the cell phone" and that he was "forced to pry [it] from out of [her] hands." *Id.*  He alleges that when Amber refused to allow him to search the cell phone he honored her refusal and did not search the phone. *Id.* at ¶ 24.

As for Joshua, he was yelling angry expletives at the police officers.  He is heard on the audio tape yelling, "Hey, you fucking be careful watching my fucking girl because she is pregnant, alright Mother Fucker." *See Ransom Audiotape* at 2:31. He recalls that as he tried to exit the truck, "Officer Ransom suddenly shoved

me back into the truck and told me not to get out." *Oquendo Declaration (Dkt. No. 25-4)* at ¶ 40.  Officer Ransom was concerned "that Joshua was going to intervene with Officer Martinez so I ordered him to stay in the vehicle.  *Ransom Declaration (Dkt. No. 17-4)* at ¶ 14.

Officer Martinez states that he conducted a pat-down search of Amber before placing her in the patrol car.  *See Martinez Declaration, supra,* at ¶ 19. Officer Ransom states that he did the same for Joshua.  *See Ransom Declaration, supra* at ¶ 15.

During this initial pat-down search, the officers told Amber and Joshua that they were only being detained, not arrested.  *See Martinez Audiotape* at 9:02. Amber and Joshua were then placed in separate patrol cars after being subjected to a full search.

Amber alleges that Officer Martinez "shoved and stuffed me into his car . . . ." *See Amber Oquendo Declaration, supra,* at ¶ 66.  He then closed the car door with the windows rolled up.  *Id.* at ¶ 68.  Amber recalls that "the car was not running, there was no air conditioning and it was extremely hot and muggy."  *Id.* at ¶ 69.  She "panicked" and yelled for help, feeling "that I couldn't breathe."  *Id.* at ¶ 70.  Eventually another officer saw her distress and rolled down the window so she "could get some air."  *Id.*

With Amber and Joshua in the patrol cars, Officer Bonas ran his drug-dog around the truck to sniff for drugs.  The dog did not alert on anything.  According to Joshua's recollection, "[i]t took a minute or so for the dog to complete its run around our car . . . ."  *Id.* at ¶ 82.  Officer Bonas also testified that it takes about a minute to run a drug-dog around the car.  *See Bonas Deposition, supra,* at p. 54.

The plaintiffs were transported to the jail where, as discussed above, Officer Martinez completed the citation for a broken tail light and gave the citation to Amber.  The officers booked Amber and Joshua on charges of resisting and obstructing an officer under Idaho Code § 18-705.

On August 15, 2013, Ada County Magistrate Judge John Hawley found probable cause for the charges.  *See Exhibits A & B (Dkt. No. 24-3).*  The charges were later dismissed.

## LITIGATION BACKGROUND

The plaintiffs filed this action under § 1983 alleging that their constitutional rights were violated.  The constitutional deprivations alleged by plaintiffs include the following:  (1) Amber was groped during a search in violation of the Fourth Amendment; (2) Amber was prevented from video recording the incident in violation of the First Amendment; (3) Amber's video was deleted by Officer Martinez in violation of the First and Fourth Amendments; (4) Amber and Joshua were subjected to excessive force and to an illegal search in violation of the Fourth

Amendment; and (5) the traffic stop was unduly prolonged for a drug-dog sniff in violation of the Fourth Amendment.

The defendants have filed a motion for partial summary judgment seeking a ruling that they have qualified immunity from the claims that (1) Amber was prevented from video recording the incident; (2) the plaintiffs were improperly searched; (3) the traffic stop was improperly prolonged; and (4) the plaintiffs were improperly ordered to exit their truck. Defendants also seek summary judgment on the claims of malicious prosecution, battery, and the *Monell* claims against the City of Boise.

Plaintiffs filed a cross-motion for summary judgment seeking a ruling that their constitutional rights were violated when (1) they were commanded to exit their vehicle for the drug-dog sniff, (2) the traffic stop was improperly prolonged for the drug-dog sniff; and (3) they were searched incident to an illegal arrest.

The Court will begin with an analysis of the legal standards governing qualified immunity, and then address first the qualified immunity claims of defendants and then later the other claims of both parties.

## LEGAL STANDARDS

## Qualified Immunity – Legal Standards

The defendants ask the Court to hold as a matter of law that they are entitled to qualified immunity. The doctrine of qualified immunity "protects government

officials from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Pearson v. Callahan*, 555 U.S. 223, 231 (2009).  Qualified immunity gives government officials "breathing room to make reasonable but mistaken judgments about open legal questions. When properly applied, it protects all but the plainly incompetent or those who knowingly violate the law." *Ashcroft v. al–Kidd*, 563 U.S. 731, 743 (2011).

In determining whether an officer is entitled to qualified immunity, the Court must determine (1) whether there has been a violation of a constitutional right; and (2) whether that right was clearly established at the time of the officer's alleged misconduct.  *Lal v. California*, 746 F.3d 1112, 1116 (9th Cir. 2014). Consequently, at summary judgment, an officer may be denied qualified immunity in a Section 1983 action "only if (1) the facts alleged, taken in the light most favorable to the party asserting injury, show that the officer's conduct violated a constitutional right, and (2) the right at issue was clearly established at the time of the incident such that a reasonable officer would have understood his or her conduct to be unlawful in that situation."  *Torres v. City of Madera*, 648 F.3d 1119, 1123 (9th Cir. 2011).

## Qualified Immunity for Drug-Dog Sniff

The first question in the *Torres* analysis asks whether plaintiffs' Fourth Amendment rights were violated when the police K-9 sniffed for drugs around their car.  In *Rodriguez v. U.S.,* 135 S.Ct. 1609, 1614-16 (2015), the Supreme Court held that a drug-dog sniff of a vehicle conducted during a traffic stop must be supported by an independent, reasonable suspicion of criminal activity if it adds any time to the stop.

Here, the defendants do not argue that they had an independent reasonable suspicion of criminal activity that allowed them to prolong the traffic stop. Instead, they argue that the K-9 sniff did not prolong the stop beyond the time it would normally take to issue the citation.

This argument would prevail if the four officers – at the time they approached the truck with the drug-sniffing dog – had a citation in hand, and explained the citation to Amber as the drug-dog took its run around the car. Conducting the drug sniff simultaneously with the issuance of the citation does not run afoul of the Fourth Amendment.  *Illinois v. Caballes,* 543 U.S. 405 (2005).

But that is not what happened here.  As discussed above, Officer Martinez did not write out the citation prior to approaching the truck with the other officers. He and the other officers were approaching the truck with a single goal in mind – to conduct the drug sniff.  They ordered the plaintiffs out of the truck not to explain the citation – they had no citation to explain – but instead to allow for the drug

sniff.  Amber was not given the citation until she had been arrested and taken to the police station for booking.

In other words, the officers had abandoned the purpose of the traffic stop to conduct the drug sniff.  There were four officers on the scene, and they could have easily pursued simultaneously the purpose of the traffic stop and the drug sniff.  As discussed above, the traffic stop was prolonged by 12 to 17 minutes for the drug-dog sniff.  As a matter of law, that delay violated plaintiffs' Fourth Amendment rights under *Rodriguez.*

A persuasive, although not binding, decision from the Idaho Court of Appeals reached the same result.  *State of Idaho v. Aguirre,* 112 P.2d 848 (Id.Ct.App. 2005).  There, as here, the officers did not allocate the tasks of citation writing and drug investigation, abandoned the initial purpose of the traffic stop, and concentrated entirely on the drug-dog sniff.  *Id.* at 852.  There, as here, the driver was not given his citation until after he was arrested and transported to the jail.  *Id.*  The Idaho Court of Appeals held that this constituted a Fourth Amendment violation.  *Id.*  The Court finds the decision persuasive due to its many similarities with this case.

This brings the Court to the second question under *Torres:*  Was the plaintiffs' constitutional right to not have the traffic stop prolonged by a drug-dog sniff clearly established at the time of the incident such that a reasonable officer

would have understood his conduct to be unlawful in that situation.  While the drug-dog sniff in this case violated *Rodriguez,* that case was not decided until 2015, two years after the incident in question here, which occurred in 2013.  While the Idaho Court of Appeals decision in *Aguirre* was decided in 2005, several other cases did allow for a brief delay of perhaps 2 to 8 minutes.

For example, the Eighth Circuit decision that was reversed by *Rodriguez* noted that "we have repeatedly upheld dog sniffs that were conducted minutes after the traffic stop concluded."  *U.S. v. Rodriguez,* 741 F.3d 905, 907 (8th Cir. 2014). That statement is followed by a list of cases holding that brief delays were "a de minimis intrusion on personal liberty."  *Id.*  The delays in these cases were between 2 and 4 minutes (with one case involving a delay of "well under 10 minutes").  *Id.*

For example, the list included *U.S. v. Alexander*, 448 F.3d 1014, 1017 (8th Cir.2006), a case decided after *Caballas* but before *Rodriguez* holding (without making any finding of reasonable suspicion) that prolonging a traffic stop for 4 minutes beyond its completion was a not a Fourth Amendment violation.  In *Rodriguez* itself, the Eighth Circuit held that a 7 or 8-minute delay for a drug-dog sniff was de minimis and without constitutional significance.  *Rodriquez,* 741 F.3d at 907.

The case law in the Ninth Circuit was somewhat similar prior to *Rodriguez.* In *U.S. v. Turvin,* 517 F.3d 1097, 1102-03 (9th Cir. 2008), the Circuit held that a traffic stop may be prolonged for a drug-dog sniff, even in the absence of reasonable suspicion, when there is only a "brief" delay, which in that case was 4 minutes.[3]  *Id.* at 1103-04; *see also U.S v. Johnson,* 2015 WL 875016 at *12 (D. Nevada March 2 2015) (holding that a delay of "four to five minutes . . . constituted no more than a de minimis intrusion on Defendant['s] . . . Fourth Amendment rights").[4]  *Turvin* turned away from holding a stopwatch to police conduct, citing with approval cases from other jurisdictions holding that "police are not constitutionally required to move at top speed or as fast as possible."  *Id.* at p. 1102 (citing *U.S. v. Hernandez*, 418 F.3d 1206, 1212 n. 7 (11th Cir.2005)). *Turvin* ultimately concluded that "[r]ather than bright-line simplification, the Constitution requires a reasonableness analysis."

Some of these pre-*Rodriguez* cases essentially borrowed a line of analysis from *Pennsylvania v. Mimms,* 434 U.S. 106 (1977).  That case found that requiring a driver to exit his vehicle after being lawfully stopped was a mere "de minimis" intrusion that did not violate the Fourth Amendment.  This analysis was extended

---

[3] In *Turvin* the Circuit held that a prolonged traffic stop was proper even without a finding that there was reasonable suspicion of criminal activity.  *Id.* at 1103-04.

[4] *Johnson* was decided about 6 weeks before *Rodriguez* was filed.

(Continued)

**Memorandum Decision & Order – page 16**

by some pre-*Rodriguez* cases to uphold drug-dog sniffs causing only brief delays because this intrusion was de minimis.[5]

These cases approved delays of between 2 and 8 minutes.  The delay here was between 12 and 17 minutes, according to the officers' own testimony.  The parties cite no case – and the Court has been unable to locate any case – that approved a 12 to 17-minute delay.  Accordingly, the Court finds that any reasonable officer would have known that the traffic stop here was prolonged even beyond the brief time allowed by the law prior to *Rodriguez.*  The Court therefore finds that the officers are not entitled to qualified immunity for prolonging the traffic stop to conduct a drug-dog sniff.

## Qualified Immunity – Required to Exit the Vehicle

The plaintiffs seek summary judgment that their constitutional rights were violated by being required to exit the truck.  Defendants respond by arguing that no rights were violated and that even if they were, the officers are entitled to qualified immunity.

---

[5] *Turvin,* in citing with approval an Eighth Circuit case approving a brief delay of a traffic stop so the officer could ask three drug-related questions, stated that "[w]e need not pass upon that court's adoption of a de minimis exception justifying brief questions."  *Turvin,* 517 F.3d 1102.  The reliance by other courts on the de minimis exception to justify prolonging traffic stops for dog sniffs came to an end when the Supreme Court in *Rodriguez* refused to apply *Mimms* to a drug-dog sniff.  *Rodriguez,* 135 S.Ct. 1615-16.

Under *Rodriguez,* the plaintiffs' Fourth Amendment rights were violated when they were commanded to exit the vehicle.  While the Supreme Court allows police to issue an exit order while pursuing the mission of a traffic stop, *Pennsylvania v. Mimms,* 434 U.S. 106 (1977), that does not extend to a situation where the traffic stop has been abandoned for a drug-dog sniff.  *Rodriguez,* 1354 S.Ct. at 1616.  Because the exit order here was issued after the purpose of the traffic stop was abandoned for a drug-dog sniff, the plaintiffs'' Fourth Amendment rights were violated under *Rodriguez.*  This brings the Court to the second question under *Torres:*  Was the plaintiffs' constitutional right to not be ordered to exit their car for a drug-dog sniff clearly established at the time of the incident such that a reasonable officer would have understood the exit order to be unlawful in that situation.

Once again, the officers here did not have the benefit of *Rodriguez,* which was still two years in the future.  As discussed, cases prior to *Rodriguez* were focusing on the de minimis analysis of *Mimms.*  It would not be unreasonable for an officer to expand the *Mimms* analysis beyond the traffic stop context and use it in a drug-dog sniff context, concluding that it was only a slight inconvenience to exit the car to conduct the sniff.

Moreover, *Mimms* was based on officer safety.  The record in this case establishes that there is a safety risk to the drug-dog officer when the vehicle's

passengers are allowed to remain in the vehicle during the sniff.  As Officer Bonas testified, "I'm running the dog, and I'm watching the dog to see what he is doing and not watching the people in the vehicle.  That puts me at extreme risk."  *See Bonas Deposition, supra,* at p. 18.  There is also a safety risk to passengers because the drug-dog is also trained "to apprehend" and if the passengers cause a commotion, "the dog could take them as a threat [and] . . . something bad could happen to them."  *Id.*

Thus, prior to *Rodriquez,* a reasonable officer could apply *Mimms* to issue an exit order for a drug-dog sniff.  The plaintiffs cite no clearly established law that *Mimms'* analysis could not be used to evaluate orders to exit to conduct a drug-dog sniff.  Hence, the Court finds the officers have qualified immunity for their order that plaintiffs exit their vehicle, an order that violated plaintiffs' Fourth Amendment rights.

## Qualified Immunity – Search of Occupants

There are significant disputes over whether the plaintiffs physically resisted the officers and over the extent to which the officers searched the plaintiffs.  If the plaintiffs were physically resisting as the officers allege, they were properly arrested for violation of Idaho Code § 18-705, which provides for criminal punishment for anyone who "willfully resists, delays, or obstructs any police officer in the discharge . . . of any duty of his office . . . ."  The pat down search for

weapons followed by a full search when Amber and Joshua were placed in the patrol cars would have been proper under the officers' account of the facts.  *U.S. v. Williams,* 846 F.3d 303, 312 (2016) (holding that a search incident to arrest is not limited to a simple pat-down of the suspect and can include "a relatively extensive exploration" including a search of the insides of the suspect's pockets).  That the search may have conducted just prior to the arrest does not invalidate the search.  *U.S. v. Smith,* 389 F.3d 944, 951 (9th Cir. 2004) (holding that "when an arrest follows 'quickly on the heels' of the search, it is not particularly important that the search preceded the arrest rather than vice versa").

If the plaintiffs' account is believed, however, the result changes.  Plaintiffs allege that they did not resist or obstruct the officers in any way but only verbally abused them.  That raises a question whether the arrest was proper, putting in question also the search incident to that arrest.  Amber recalls that she was not told that she was under arrest under 20 to 25 minutes after she was searched.  *See Amber Oquendo Declaration, supra,* at ¶ 85.  If she is believed, the arrest may not have occurred "on the heels" of the search as was the case in *Smith.*  The officers had no video capability and so the Court cannot make any findings at this stage on the conflicting accounts of the parties.

Plaintiffs argue that because the officers violated their constitutional rights in ordering plaintiffs to exit the truck, the officers were not performing any "duty"

as that term is used in the Idaho Code, and hence the plaintiffs could not be lawfully charged with resisting or obstructing a non-existent "duty." Plaintiffs seek summary judgment on this issue. While the Court has held that the exit order violated plaintiffs' constitutional rights, the Court also held that those rights were not clearly established at that time. Thus, it would not be clear to a reasonable officer that he had no authority to issue an exit order – the officer could reasonably believe he had that authority and hence was performing a "duty" as that term is used in the Idaho Code.

Because of the questions of fact, the Court cannot make any finding on plaintiffs' request for summary judgment or on the officers' request for qualified immunity. *See Wilkins v. City of Oakland,* 350 F.3d 949, 956 (9th Cir. 2003). (holding that "[w]here the officers' entitlement to qualified immunity depends on the resolution of disputed issues of fact in their favor, and against the non-moving party, summary judgment is not appropriate"). Moreover, those same questions of fact preclude any summary judgment for plaintiffs on this issue. This issue must be presented to a jury.

## Qualified Immunity – Search of Cell Phone & Deletion of Video

Amber claims in Count I of the complaint that her First Amendment rights were violated when Officer Martinez retaliated against her for videoing the incident with her cell phone. She also claims in Count III that her Fourth

Amendment rights were violated when Officer Martinez seized and searched her cell phone.  The officers seek summary judgment on this claim.  As discussed above, there is a question of fact over whether Officer Martinez searched the cell phone and deleted the video.  This dispute cannot be resolved on summary judgment.

The Court would note that in *Riley v. California*, 134 S.Ct. 2473 (2014), the Supreme Court unanimously held that warrantless searches of cell phones seized incident to arrest violate the Fourth Amendment.  *Id.* at 2495.  But *Riley* was decided about a year after the incident in question here.  Could cell phones, seized during a search incident to arrest, be examined in 2013 when this incident occurred?  The Ninth Circuit has held that under the pre-*Riley* caselaw it was "objectively reasonable" for police to search cells phones seized during a lawful search incident to arrest.  *U.S. v. Lustig,* 830 F.3d 1075, 1080 (9th Cir. 2016).  Of course, here we have an allegation that not only was the cell phone searched but a video deleted.  Defendants cite no law that would allow a deletion, if it occurred.

This, then, is the legal background that will govern the cell phone issue, but the conflicting accounts of the cell phone search and the deletion of the video preclude the Court from resolving this issue on summary judgment.  It must therefore await trial.

## Policy & Custom – *Monell* Liability Against Boise City

Plaintiffs' allege in Count VIII that the policies and customs of the City of Boise caused the constitutional deprivations in this case.  The Supreme Court has held that local government units are "persons" for purposes of § 1983.  *Monell v. Dep't of Soc. Servs. of City of N.Y.*, 436 U.S. 658, 690 (1978).  But a municipality is liable under *Monell* only if a municipal policy or custom was the "moving force" behind the constitutional violation.  *Villegas v. Gilroy Garlic Festival Ass'n,* 541 F.3d, 950, 957 (9th Cir.2008).  In other words, there must be "a direct causal link between a municipal policy or custom and the alleged constitutional deprivation." *Id.*

Here, Boise City had a policy that gave the drug-dog officers complete discretion to determine whether a drug-dog sniff should be undertaken.  *See Boise City Police Policy Manual (Dkt. No. 25-15)* at pp. 16-17.  There is nothing in the policy directing officers to avoid prolonging a traffic stop for a drug-dog sniff or even to take into account the possibility of delay in determining whether to deploy the drug-dog.  The policy makes no attempt to require adherence to Supreme Court decisions.

This policy is unconstitutional on its face for ignoring Supreme Court law. *Kirkpatrick v. City of Los Angeles,* 803 F.2d 485, 492 (9th Cir.1986).  Because the written policy is unconstitutional on its face, the causal relationship between the policy and the constitutional tort may be proved by evidence of a single event

rather than a pattern of events that is required when the policy is not unconstitutional on its face. *Id.* Here, there is a clear causal relationship between a policy that ignores the law and police conduct that violates that same law. Hence the defendants' motion for summary judgment seeking to dismiss the claims against the City of Boise will be denied.

## Excessive Force

In Count IV of the complaint, plaintiffs claim they were subjected to excessive force. While there was some misunderstanding in the early briefing, the defendants stated in their reply brief that they were not seeking summary judgment on this claim. *See Reply Brief (Dkt. No. 28)* at p. 3. The Court will accordingly not rule on this claim at this time.

## Malicious Prosecution

In Count VII, the plaintiffs charge the officers with malicious prosecution. Malicious prosecution actions are not limited to suits against prosecutors but may be brought against other persons who have wrongfully caused the charges to be filed. *Galbraith v. County of Santa Clara*, 307 F.3d 1119, 1126-27 (9th Cir. 2002). There is a rebuttable presumption that a prosecutor exercises independent judgment in deciding to file criminal charges – or a judge exercises independent judgment in finding probable cause – thus immunizing the investigating officers from liability for injuries suffered after the charging decision. *Smiddy v Varney,*

665 F.2d 261 (9th Cir. 1981), overruled on other grounds, *Beck v. City of Upland,* 527 F.3d 853 (9th Cir. 2008).  This presumption may be rebutted with evidence that the officers "improperly exerted pressure on the prosecutor, knowingly provided misinformation to him, concealed exculpatory evidence, or otherwise engaged in wrongful or bad faith conduct that was actively instrumental in causing the initiation of legal proceedings." *Awabdy v. City of Adelanto*, 368 F.3d 1062, 1067 (9th Cir. 2004).  "Such evidence must be substantial." *Harper v. City of Los Angeles*, 533 F.3d 1010, 1027 (9th Cir. 2008).

But regardless of whether this presumption applies, "officers may always be held liable if they acted "maliciously or with reckless disregard for' the plaintiffs' rights." *Johns v. City of Eugene,* 2017 WL 663092 (D. Ore. Feb. 15, 2017) (quoting *Smiddy,* 665 F.2d at 266-67).

In this case, Magistrate Judge John Hawley found probable cause for the charges against Amber and Joshua on August 15, 2013.  *See Exhibits A & B (Dkt. No. 24-3).*  There is no evidence – substantial or otherwise – that the officers exerted undue influence over, or provided false information to, the Magistrate Judge.  Thus, there is nothing to rebut the presumption that the Magistrate Judge exercised independent judgment in reaching his finding.

Nevertheless, as stated above, the officers could still be liable if their own conduct could be described as malicious or in reckless disregard of plaintiffs'

rights.  Here, there remain disputed issues over whether the officers used excessive force, deleted Amber's cell phone video, and groped her during a search.   If a jury was to credit plaintiffs' allegations and find the officers engaged in this conduct, the jurors could reasonably find that conduct to be malicious or reckless.

While that potential would typically preclude summary judgment for defendants, there is a twist here.  Plaintiffs' complaint already contains separate allegations concerning the groping, video deletion and excessive force.  The plaintiffs have not explained how a jury could distinguish those claims from the malicious prosecution claim and award recovery on them all without creating an unfair double recovery for plaintiffs.  Thus, the Court finds the malicious prosecution claim in Count VII is redundant and will be dismissed for that reason.

**Battery**

In Count XII plaintiffs allege that the defendants committed a battery in violation of Idaho Code § 6-904.  That statue states that a governmental entity and its employees acting within the scope of their employment and "without malice or criminal intent" shall not be liable for any claim which "arises out of assault, battery . . . ."  The defendants seek summary judgment on this claim on the ground that there is no evidence in the record that they acted with malice.

The battery allegedly occurred during the search and groping of Amber and the search and restraint of Joshua.  But the police conduct is already put at issue by

other claims, especially the excessive force claim.  Plaintiffs do not explain how a jury could award recovery for the battery claim and the excessive force claim without awarding a double recovery.  Therefore, the Court will dismiss this claim as redundant.

**Plaintiffs' Motion for Partial Summary Judgment**

Plaintiffs filed a cross-motion for summary judgment seeking a ruling that their constitutional rights were violated when (1) they were commanded to exit their vehicle for the drug-dog sniff, (2) the traffic stop was improperly prolonged for the drug-dog sniff; and (3) they were searched incident to an illegal arrest.

In the discussion above, the Court held that plaintiffs' constitutional rights were violated (1) when they were commanded to exit their vehicle for the drug-dog sniff, and (2) the traffic stop was improperly prolonged for the drug-dog sniff. With regard to the search incident to arrest, the Court found questions of fact that preclude summary judgment for either side.

The Court will therefore grant in part the plaintiffs' motion for partial summary judgment.

**Conclusion**

The Court will summarize its holdings below:

1. **Drug-Dog Sniff:**  The plaintiffs' Fourth Amendment rights were violated when the traffic stop was prolonged for the drug-dog sniff.  The officers are not entitled to qualified immunity for this violation.

2. **Order to Exit the Truck:**  The plaintiffs' Fourth Amendment rights were violated when they were ordered to exit their truck but the officers are entitled to qualified immunity for that violation.
3. **Search of Plaintiffs:**  Questions of fact preclude summary judgment for either side on whether the search of plaintiffs violated their Fourth Amendment rights.
4. **Search of Cell Phone & Deletion of Video:**  Questions of fact preclude summary judgment on whether the search of the cell phone and deletion of video violated plaintiffs' First and Fourth Amendment rights.
5. ***Monell* Claims Against City:**  The Court will deny the City's motion for summary judgment on these claims.
6. **Excessive Force:**  These claims are not at issue in these cross-motions and hence remain for trial.
7. **Malicious Prosecution:**  The Court finds this claim redundant and will grant defendants' motion for summary judgment on this claim.
8. **Battery Under Idaho Law:**  The Court finds this claim redundant and will grant defendants' motion for summary judgment on this claim.

## ORDER

In accordance with the Memorandum Decision set forth above,

NOW THEREFORE IT IS HEREBY ORDERED, that the motion for partial summary judgment (docket no. 19) and the motion for summary judgment (docket no. 17) are GRANTED IN PART AND DENIED IN PART, in accordance with the findings set forth above in the "Conclusion" section of the decision.

DATED: March 3, 2017

B. Lynn Winmill
Chief Judge
United States District Court